

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 9, 2021

BY CM/ECF

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:     United States v. Meyya Meyyappan
>            21 Cr. 22 (PKC)

Dear Judge Castel:

        The Government submits this letter in advance of the sentencing of defendant Meyya Meyyappan, scheduled for June 16, 2021. For the reasons set forth below, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment within the applicable Guidelines range of zero to six months' imprisonment.

A.      The Offense Conduct

        The Government agrees with the statement of offense conduct set forth in the presentence investigation report, dated April 5, 2021 ("PSR"). (PSR ¶¶ 7-22). In summary, the offense conduct was as follows.

1.      The Defendant and Restrictions on Employment Outside of NASA

        From 1996 to 2021, Meyyappan was employed by the National Aeronautics and Space Administration ("NASA"), an independent U.S. government agency responsible for the civilian space program, as well as aeronautics and aerospace research. Beginning in 2006, Meyyappan became the Chief Scientist, Exploration Technology at the Center for Nanotechnology, at NASA's Ames Research Center at Moffett Field in Silicon Valley, California. (PSR ¶ 8).

        In his position at NASA, Meyyappan was subject to certain statutory, regulatory, and agency restrictions and reporting requirements regarding, among other things, outside employment, travel, and compensation. For example, in 2011, Congress passed the Department of Defense and Full-Year Appropriations Act, Public Law 112-10, and the Consolidated and Further Continuing Appropriations Act of 2012, Public Law 112-55 (collectively, the "Acts"). Under the so-called China Exclusion Policy set forth in the Acts, NASA was prohibited from using

appropriated funding to enter into or fund any grant or cooperative agreement of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company. NASA defined "China or any Chinese-owned company" to include Chinese universities because Chinese universities are considered to be incorporated under the laws of the People's Republic of China ("PRC"). (PSR ¶¶ 9-10).

As a NASA employee, Meyyappan was also prohibited by federal regulation from engaging in any outside employment activities, without approval, meaning any form of compensated or uncompensated non-federal employment or business relationship involving the provision of personal services by the employee, including as a speaker or teacher. *See* 5 C.F.R. § 6901.103. (PSR ¶ 11).

Meyyappan was further required by federal regulation to file annually with the U.S. Office of Government Ethics ("OGE") a public financial disclosure report on OGE Form 278e ("Public Financial Disclosure Report"). *See* 5 C.F.R. §§ 2634 & 2635. Among other things, the defendant was required to disclose to OGE and NASA any positions held outside the U.S. government, any employment agreements and arrangements, any sources of income exceeding $5,000, and any gifts and travel reimbursement, and to "certify that the statements [he] made on [the Public Financial Disclosure Report] and all attached schedules are true, complete and correct to the best of [his] knowledge." *Id.*; (PSR ¶ 12).

## 2. The Defendant's Outside Employment in China, South Korea, and Japan

The PRC's Thousand Talents Program ("Thousand Talents Program") is a program established by the Chinese government to recruit individuals, including U.S. scientists and researchers, with access to or knowledge of foreign technology or intellectual property. Through this and similar programs, the Chinese government has created a significant financial incentive for foreign, talented individuals engaged in research and development to transfer the technology and intellectual property to China, licitly or otherwise, in exchange for salaries, research funding, lab space, and other incentives. *See generally* Threats to the U.S. Research Enterprise: China's Talent Recruitment Plans, United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Government Investigations, *available at* https://www.hsgac.senate.gov/imo/media/doc/2019-11-18%20PSI%20Staff%20Report%20-%20China's%20Talent%20Recruitment%20Plans%20Updated2.pdf. (PSR ¶ 13).

In 2016, Meyyappan applied for admission to the Thousand Talents Program. Thereafter, he was accepted into and participated in the Thousand Talents Program, including by traveling to China and recommending others for admission to it. Between at least 2014 and 2020, Meyyappan was also a visiting professor at Soochow University, a research university in China funded by the PRC. In that capacity, Meyyappan traveled to China, gave lectures, wrote research papers, and received reimbursement for his travel. Email communications between Meyyappan and his Thousand Talents Program contact indicated that Meyyappan's annual salary would be 1.8 million RMB, which is equivalent to approximately $280,000. Assuming that this salary was in fact paid, the defendant received approximately $1.4 million over five years from his affiliation with the program. (Because the payments would have been made in China, the Government has

not been able to confirm that the salary was received.)  In addition, Meyyappan kept an office and an apartment in China.  (PSR ¶¶ 14-15, 22).

In addition, Meyyappan held professorships at universities in South Korea and Japan. Between at least 2009 and 2020, he was a distinguished visiting professor at Pohang University of Science and Technology ("POSTECH"), a research university in South Korea.  In that capacity, Meyyappan traveled to South Korea, gave lectures, wrote research papers, and received reimbursement for his travel.  Between at least 2013 and 2020, Meyyappan was also a visiting professor at Tohoku University, a research university located in Japan.  In that capacity, he traveled to Japan, gave lectures, wrote research papers, and received reimbursement for his travel.  (PSR ¶¶ 16-17).

> 3.  Meyyappan Fails to Disclose His Foreign Employment to NASA

Despite the various restrictions that applied to him, Meyyappan failed disclose to NASA and OGE his foreign employment and compensation.  For example, between at least 2012 and 2019, he failed to disclose on his Public Financial Disclosure Reports his membership in the Thousand Talents Program, his professorships at universities in China, South Korea, and Japan, and the related compensation and travel reimbursements.  (PSR ¶¶ 18-19).  He also failed to disclose his travel to China, South Korea, or Japan.  And did not disclose his foreign compensation on his tax returns.

> 4.  Meyyappan Lies About His Foreign Employment

On October 27, 2020, Meyyappan was interviewed by the Federal Bureau of Investigation, the NASA Office of Inspector General ("NASA OIG"), and the United States Attorney's Office for the Southern District of New York ("USAO SDNY"), in New York, New York.  During that interview, Meyyappan falsely stated, among other things, that he was not a member of the Thousand Talents Program, and that he did not hold a professorship at Soochow University in China.  (PSR ¶ 20).

> B.  The Guilty Plea

On January 13, 2021, the defendant pled guilty, pursuant to a plea agreement, to a one-count Information that charged him with making false statements to the FBI, NASA OIG, and the USAO SDNY during his October 27, 2020 proffer, in violation of 18 U.S.C. § 1001.

> C.  The Applicable Sentencing Guidelines

The Probation Department's Sentencing Guidelines calculation of zero to six months' imprisonment is consistent with the Stipulated Guidelines Range in the plea agreement (PSR ¶¶ 5, 29-40, 74).

D.     The Appropriate Sentence

Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that the Court sentence the defendant to a Guidelines sentence of imprisonment.

*First*, as Meyyappan concedes, the offense conduct was "undoubtedly serious": lying to the FBI, NASA-OIG, and the USAO SDNY about his association with the PRC-sponsored Thousand Talents Program and his related professorship at a Chinese research university.  (Br. 12).  But this was not a one-time mistake during a proffer session.  For approximately eight years, Meyyappan lied on his Public Financial Disclosure Reports filed with the OGE, failing to disclose not only his membership in the Thousand Talents Program and his Chinese professorship, but also his professorships at universities in South Korea and Japan, and the related compensation and travel reimbursements.  (PSR ¶¶ 18-19).  And he failed to disclose his compensation on his tax returns.  Meyyappan engaged in this long-running deception because he knew that, as a senior NASA scientist in charge of nanotechnology research, this foreign employment and compensation was strictly prohibited.  Meyyappan also knew that, because he held a sensitive position in the U.S. government, he was engaged in a repeated breach of his duties of trust and loyalty to this country.

Meyyappan's sentencing submission does not say why he engaged in this long-running scheme.  One answer is greed.  As his emails suggest, the Chinese government appears to have paid him almost $300,000 per year, provided him with an apartment and office in China, and paid for numerous overseas trips for him.  The PRC was not paying the defendant simply to publish papers on unsensitive matters, as he suggests in his brief.  (Br. 10).  Meyyappan was being paid to pass sensitive and confidential NASA research to China, a foreign adversary.  That was why he concealed these associations for years and, when confronted about it during his proffer session, he lied.  If Meyyappan were really writing innocuous research papers, there would have been no reason to hide his foreign employment and compensation from the Government.

The Government's investigation has revealed that Meyyappan: (a) provided Chinese researchers with technical data, documents, and guidance regarding graphene field-effect transistor (GFET) array biosensors; (b) assisted Chinese researchers in developing a chip-based system for rapid on-site/on-demand detection used for food security and healthcare purposes; (c) assisted Chinese researchers with designing experiments to develop a new ink formulation used for various types of nanomaterials and the printing process for nanodevice fabrication; and (d) helped a Chinese company manufacture a nanotechnology sensor that is currently being integrated into smartphones, the same technology being worked on by NASA.  What is more, Meyyappan gave Chinese nationals access to NASA's facilities.

The length and seriousness of the offense conduct, and the need for the sentence imposed to reflect the seriousness of the offense and to provide just punishment requires a Guidelines sentence of imprisonment.

*Second*, and relatedly, the history and characteristics of the defendant dictate a term of imprisonment.  The Government agrees that the defendant was an accomplished scientist with impressive educational and research credentials.  (Br. 2-9).  He is clearly a highly intelligent man,

who knows right from wrong. And he knew, given his prominent position at NASA, that he was strictly prohibited from having foreign employment and from sharing confidential Government information with a foreign adversary. That is why he lied about it for years.

*Third*, a Guidelines sentence is appropriate to promote respect for the law and to afford adequate deterrence. Now that the defendant has lost the career that he clearly cherished, the Government agrees that considerations of specific deterrence do not appear relevant to this defendant. (Br. 11). However, a term of imprisonment is appropriate for reasons of general deterrence. When a high-level U.S. government employee breaches the duties that he owes to his country by passing sensitive and confidential scientific research to the Chinese, and then lies about it, a message must be sent that this serious conduct that will be punished. A sentence of time-served or probation, as the defendant requests, is insufficient. (Br. 12).

Accordingly, the Government respectfully submits that a Guidelines sentence of imprisonment is appropriate.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:    /s/_____
Joshua A. Naftalis
Assistant United States Attorney
(212) 637-2310

cc:    Arthur Aidala, Esq.