L6G5meyS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          21 Cr. 22 (PKC)
                                         Remote Proceeding
5   MEYYA MEYYAPPAN,

6                Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         June 16, 2021
9                                        2:10 p.m.

10  Before:

11                    HON. P. KEVIN CASTEL,

12                                       District Judge

13
                         APPEARANCES
14
    AUDREY STRAUSS
15       United States Attorney for the
         Southern District of New York
16  BY:  JOSHUA A. NAFTALIS
         Assistant United States Attorney
17
    LAW OFFICES OF AIDALA & BERTUNA, P.C.
18       Attorneys for Defendant
    BY:  ARTHUR LOUIS AIDALA
19

20

21

22

23

24

25

L6G5meyS

 1                (Case called; The Court and all parties appearing

 2      remotely)

 3                THE COURT:  Appearing for the government, please?

 4                MR. NAFTALIS:  Good afternoon, your Honor.  Joshua

 5      Naftalis for the government.

 6                THE COURT:  Good afternoon, Mr. Naftalis.

 7                Appearing for the defendant?

 8                MR. AIDALA:  Arthur Aidala.  Good afternoon, your

 9      Honor.

10                THE COURT:  Good afternoon, Mr. Aidala.  It is good to

11      see you again even so soon.

12                Good afternoon, is that Mr. Meyyappan on?

13                THE DEFENDANT:  Yes.  This is Meyya Meyyappan, your

14      Honor.  Good afternoon.

15                THE COURT:  Good afternoon.

16                Now, Mr. Meyyappan, I guess by answering I know that

17      you can hear me, correct?

18                THE DEFENDANT:  Yes, sir.

19                THE COURT:  And can you see me as well?

20                THE DEFENDANT:  Yes, your Honor.

21                THE COURT:  And I understand that you have signed a

22      waiver of your right to physically appear in a courtroom with

23      your lawyer at your side, and that you have agreed to proceed

24      today by video with the telephone link; is that correct, sir?

25                THE DEFENDANT:  Yes, your Honor.

L6G5meyS

| | |
|---|---|
| 1 | THE COURT:  Now, you should understand that the Court |
| 2 | is perfectly willing to adjourn this proceeding to a date and |
| 3 | time where you can be physically present in a courtroom. |
| 4 | Do you prefer that I do that? |
| 5 | THE DEFENDANT:  No, your Honor.  Today is fine. |
| 6 | THE COURT:  All right. |
| 7 | THE DEFENDANT:  This video appearance is fine. |
| 8 | THE COURT:  Mr. Naftalis, maybe you explain to me and, |
| 9 | if not, we will defer to Mr. Aidala, why there would be |
| 10 | substantial harm to the interests of justice by delaying this |
| 11 | sentencing for an in court proceeding. |
| 12 | MR. NAFTALIS:  Your Honor, my understanding is that |
| 13 | the defendant agreed to proceed via video; he is in California |
| 14 | and the question of the -- and I don't understand him to have |
| 15 | been vaccinated, it is my understanding from Mr. Aidala, |
| 16 | because of his health conditions, and in the interest of moving |
| 17 | this case forward and balancing that with Mr. Meyyappan's |
| 18 | health, we thought it best to consent to the video. |
| 19 | THE COURT:  All right.  Mr. Aidala, anything on your |
| 20 | front on that subject? |
| 21 | MR. AIDALA:  No, your Honor.  The prosecutor has |
| 22 | accurately voiced the situation which is that my client has |
| 23 | some medical issues and the doctors advised against him getting |
| 24 | any type of vaccine. |
| 25 | THE COURT:  All right. |

L6G5meyS

1       First of all, I find that the waiver of appearance is

2   knowing and voluntary and it is accepted.  Further, I find that

3   this proceeding cannot be delayed further without substantial

4   harm to the interests of justice because, among other things,

5   the defendant has desires for the sentencing to go forward and

6   desires not to travel to New York for the purpose of the

7   sentencing proceeding, so I find that the CARES Act finding has

8   a basis and I make that finding.

9       Now, Mr. Aidala, I have a presentence report revised

10  by probation on April 5, 2021.  I have a letter from you dated

11  June 2, 2021 which has several attachments to it.  I have a

12  letter from the government dated June 9, 2021, and I have a

13  letter from NASA dated June 14, 2021, and a response letter

14  from you dated June 15, 2021.

15      Do I have everything I should have as a result of,

16  bearing on the subject of sentencing?

17      MR. AIDALA:  Yes, your Honor.  I just want to make

18  sure, my letter of June 2nd, which was my presentence

19  memorandum, that does have some accompanying character letters;

20  is that correct?

21      THE COURT:  It absolutely does, and the attachments

22  are themselves, while the total document is 12 pages and then

23  the attachments thereof are eight pages in length including

24  letters from Dr. Estrada, from Patrick Fay, from Samar Saha,

25  from Jin-Woo Han, from Professor Adesida and the defendant's

L6G5meyS

1    wife.

2           Mr. Naftalis, from the government's standpoint, do I

3    have everything I should have on the subject of sentence?

4           MR. NAFTALIS:  Yes, your Honor.

5           THE COURT:  Mr. Aidala, has your client read,

6    reviewed, and discussed with you the presentence report,

7    recommendation, and addendum?

8           MR. AIDALA:  Yes, your Honor.

9           THE COURT:  Does the defendant have any objection to

10   the facts set forth in the presentence report?

11          MR. AIDALA:  No, your Honor.

12          THE COURT:  Does the defendant have any objections to

13   the guideline calculation set forth in the presentence report?

14          MR. AIDALA:  No, your Honor.

15          THE COURT:  Mr. Naftalis, does the government have any

16   objections to the facts set forth in the presentence report?

17          MR. NAFTALIS:  No, your Honor.

18          THE COURT:  Does the government have any objections to

19   the guideline calculation?

20          MR. NAFTALIS:  No, your Honor.

21          THE COURT:  Let me get one factual point which is a

22   discrepancy between what I have been told by defense counsel

23   and what appears in the presentence report.  Paragraph 63

24   reports that, per the defendant, he is currently on

25   administrative leave, paid, due to his involvement in the

L6G5meyS

1    instant offense.  I understood from Mr. Aidala's June 15th,

2    2021 letter that that is not presently true.

3              Mr. Aidala?

4              MR. AIDALA:  Yes, your Honor.  Upon entering a plea of

5    guilty, he was fired.

6              THE COURT:  All right.  And so what I don't

7    understand -- he wasn't interviewed for the PSR until after he

8    entered a plea of guilty, right?

9              MR. AIDALA:  Yes, your Honor.

10             THE COURT:  And when he was interviewed, the report

11   said he was on paid leave.

12             MR. AIDALA:  There may have been a slight delay

13   between him being on administrative leave and actually getting

14   the letter that he was fired.  We did the presentence report

15   interview relatively quickly after his plea but I can tell you

16   that he has been terminated from NASA.

17             THE COURT:  When was that?  Maybe you can find out

18   from your client.

19             THE DEFENDANT:  April 23rd.

20             THE COURT:  April 23rd.  All right.

21             THE DEFENDANT:  After the presentencing report was

22   submitted to you.

23             THE COURT:  So, why don't we write into paragraph 63:

24   On April 23, 2021, the defendant was terminated by NASA.

25             THE DEFENDANT:  Correction, your Honor.  The

L6G5meyS

1    termination was effective April 23rd but the letter was given

2    about 10 days before.

3              THE COURT:  Why don't I put it then -- thank you.

4              THE DEFENDANT:  Yes.

5              THE COURT:  Effective April 23, 2021, defendant was

6    terminated by NASA.

7              THE DEFENDANT:  Yes.  That's fine.

8              THE COURT:  That will be inserted at the last sentence

9    of paragraph 63.  Any objection from the defendant.

10   Mr. Aidala?

11             MR. AIDALA:  No, your Honor.

12             THE COURT:  From the government?

13             MR. NAFTALIS:  No, your Honor.

14             THE COURT:  I adopt, as my findings of fact, the facts

15   set forth in the presentence report with the one amendment I

16   have just made, and further I find the guidelines were

17   correctly calculated and the defendant is in total offense

18   level 4, Criminal History Category I.

19             Mr. Aidala, I will hear you on behalf of your client.

20             MR. AIDALA:  Thank you, your Honor.

21             I just wanted to give the Court a little bit of

22   context regarding this matter that I don't believe is included

23   anywhere and I think it just would help the Court in its

24   decision-making process.  That is that on December 10, 2019,

25   before I knew Mr. Meyyappan existed, he was approached by FBI

L6G5meyS

1    agents regarding a securities fraud investigation that they

2    were conducting, hence the appearance of Mr. Naftalis who I

3    believe is in that unit.  And he was asked to cooperate, not as

4    a target, but as a witness.  And he did so.  He cooperated

5    fully telling them everything they wanted.  In fact, your

6    Honor, he made controlled phone calls at their behest that were

7    record and he followed the script that they provided, etc.,

8    etc.  Typically I'm in the position of when that happens after

9    my client is the target, I would be asking for a 5K letter, but

10   since this happened before he was a target I am not in a

11   position to do so.  But, I do think it is important for the

12   Court to know how cooperative and ready, willing, and able

13   Mr. Meyyappan was to help the FBI and to help his country in a

14   securities fraud investigation.

15         As the Court obviously knows, shortly thereafter the

16   Coronavirus pandemic kind of slowed things down and nothing

17   really happened until the early part of the fall and that is

18   when the U.S. Attorney's office wanted to speak to

19   Mr. Meyyappan –– technically Dr. Meyyappan –– again, and I made

20   him available.  Because of the pandemic it was this type of a

21   forum which was a virtual forum and although we have no

22   objection to doing it now, a proffer session is a lot more of a

23   kind of give and take and back and forth and a little more

24   difficult when I am not with my client and my client is not

25   with me, you add to that degree of difficulty, your Honor; I am

L6G5meyS

1    dealing with someone who English is their second language and

2    also to say that he was an absolute nervous wreck would be an

3    understatement.  But, we proceeded and --

4              THE COURT:  Let me pause you right here and just

5    remind Mr. Meyyappan that if at any point today you wish to

6    speak in private with your lawyer Mr. Aidala, I will give you

7    the opportunity to do so.

8              Do you understand that?

9              THE DEFENDANT:  Thank you, your Honor.  I appreciate

10   it.

11             THE COURT:  I apologize, Mr. Aidala.  Please proceed.

12             MR. AIDALA:  OK.  Thank you, your Honor.

13             So, the proffer went on for a long period of time --

14   and I have done dozens of these, your Honor and I will say some

15   of them have gone better than others and I will attribute it to

16   nervousness.  Mr. Meyyappan was speaking a lot and for the

17   majority of the time my understanding is that his answers were

18   honest and truthful but there was a time when we drifted -- the

19   subject matter drifted away from the securities fraud

20   investigation and started focusing on Mr. Meyyappan himself,

21   and at one point he was asked the question of whether he was a

22   member of a group called the Thousand Talents Program that is a

23   scientific intellectual society where it is based out of China

24   and it basically hosts, in China, international scientists and

25   researchers to speak on a variety of topics.  Initially,

L6G5meyS

1    Mr. Meyyappan denied that he was a member of that group.

2            Based on my experience, had we all been in the same

3    room, Mr. Naftalis would have called me out and showed me what

4    he wound up showing me within a day or so, virtually, which was

5    an e-mail or several e-mails that show that actually my client

6    was a member of that organization.  I then spoke to my client

7    about it and we got back to Mr. Naftalis very, very swiftly and

8    said yes, Mr. Naftalis, in fact he was not honest, he was not

9    truthful.  He apologized, he attributed it to his nervousness

10   and he maybe didn't see that question or that line of

11   questioning coming, and he admitted to his guilt and accepted

12   responsibility immediately through me to the prosecutor in

13   which the prosecutor came back to me rather swiftly and said

14   after conferring with the people in his office, that they were

15   going to be charging him with lying to a federal agent.  And we

16   didn't really -- this is probably the swiftest culmination of a

17   case that I have ever been involved in where we agreed that he

18   would -- we would not make them indict the case, we would

19   accept an information, he would plead guilty to a guideline

20   range of 0 to 6 with a level 4, and we would move on.

21           So, that's really the heart of what he pled guilty to.

22   I just want wanted to, number one, let the Court know about his

23   cooperation before he had the initial -- he had the problematic

24   conversation with the federal agents; he was helpful and

25   useful.  I believe Mr. Naftalis will support that.

L6G5meyS

|   |   |
|---|---|
| 1 | I was a little surprised, your Honor, when I received |
| 2 | the government's letter, asking for this Court to incarcerate |
| 3 | my client.  It wasn't really consistent with the conversations |
| 4 | that we had had but I do know that Mr. Naftalis has supervisors |
| 5 | who he has to answer to.  I want to -- if you read that letter |
| 6 | in the case least favorable to the defendant, it almost makes |
| 7 | him sound like he is some sort of a spy.  That couldn't be |
| 8 | further from the truth, your Honor. |
| 9 | THE COURT:  Mr. Aidala, I just want to just pause at |
| 10 | this juncture and then let you go on but are you suggesting |
| 11 | that your client didn't understand the question that was asked |
| 12 | of him, that maybe there was a language problem or he was |
| 13 | anxious and he didn't understand? |
| 14 | MR. AIDALA:  No, your Honor. |
| 15 | THE COURT:  Or he misunderstood and -- |
| 16 | MR. AIDALA:  No. |
| 17 | THE COURT:   -- maybe is not guilty of this crime? |
| 18 | MR. AIDALA:  No, your Honor.  If that was what the |
| 19 | Court took away from my comments I apologize.  No.  I think he |
| 20 | was -- I think he is going to tell you shortly -- I think he is |
| 21 | going to tell you shortly that he was never in that position |
| 22 | before and he was overcome with nervousness and he lied.  And |
| 23 | he is going to admit to you again, as he already has when you |
| 24 | took his plea, that he lied and he intentionally lied and he |
| 25 | knew that he lied. |

L6G5meyS

1    THE COURT:  Mr. Aidala, the other thing that I don't

2    understand from what you said, I thought he admitted to lying

3    about another matter in addition to the Thousand Talents

4    Program.  Is that not correct?

5    MR. AIDALA:  I think that everything that he lied

6    about was around the Thousand Talents Program.

7    THE COURT:  I am talking specifically didn't he lie

8    about holding a professorship at a university?

9    MR. AIDALA:  Well, your Honor, I think that that's all

10   part of the program, your Honor.  That's all part of the

11   program.

12   THE COURT:  Go ahead.  Go ahead.

13   MR. AIDALA:  OK.

14   So, but --

15   THE COURT:  But answer my question.

16   MR. AIDALA:  OK.

17   THE COURT:  Did he lie about a professorship at a

18   university?

19   MR. AIDALA:  Well, your Honor, it depends on the word

20   "professorship."  Has he taught and given lectures in his

21   capacity as being a member of the Thousand Talents Program at

22   Soochow University?  Yes.  Did he hold a professorship at the

23   Soochow University?  I don't believe that that is accurate.

24   This is a matter of semantics, your Honor.  In other words, he

25   was not on the faculty of Soochow University.  I can't look at

L6G5meyS

1    his passport, but if you look at the passport that's in the

2    possession of the government, it is my understanding through my

3    client that he had taken four, maybe five trips to China in the

4    period of time that we are speaking of here and he never stayed

5    more than four days.  So, we are talking about a total of

6    possibly two weeks, accumulated all together, in the period of

7    time of the information.

8        THE COURT:  I am a little bit confused here because I

9    asked whether there were any objections to the presentence

10    report and the presentence report reports that between at least

11    2014 and 2020 -- that's a six year period -- defendant was a

12    visiting professor at Soochow University, a research university

13    in China funded by PRC.  In that capacity he traveled to China,

14    gave lectures, wrote research papers, and received

15    reimbursement for his travel.  I also read in the unobjected to

16    presentence report which I have adopted as my findings of fact

17    that he had an office and an apartment overseas.  Where were

18    they located, Mr. Aidala, the apartment and the office

19    overseas?

20        MR. AIDALA:  Well, your Honor, let me just clarify

21    that.  He had use of an apartment and he had use of an office

22    that he never made use of, but by the letter of the law, if I

23    was going to be exact -- and I am not trying to deceive the

24    Court in any way -- he did have the ability to use an apartment

25    as a member of the Thousand Talents Program, he did have the

L6G5meyS

1    ability to use an apartment, and I was going to address that in

2    my remarks but, he never did -- he never availed himself of

3    those things.  But, when you are a visiting member of the

4    Thousand Talents Program, you are able to use their apartment,

5    you are able to use their office, but he never availed himself

6    of those.  In fact, your Honor, I have receipts of the hotels

7    that he stayed at in lieu of staying at an apartment that was

8    available.  My understanding is that the Soochow University

9    where the Talent program -- where they have their lectures,

10   host their lectures, they just keep an apartment available and

11   an office available if my client wished to use them but he

12   never used them.

13           So, your Honor, again, it was going to be in my

14   remarks that there is no apartment where he has his clothes or

15   his belongings.  There is no office where he had his computer

16   or any of his papers.  They are -- it is accurate to say he had

17   the ability to use them so I didn't want to play it coy with

18   the Court or think I was not being honest with the Court.  He

19   could have used an apartment, he could have used an office.  He

20   never did.  But, anyone who is a member of the Thousand Talents

21   Program has the ability to use those facilities.

22           THE COURT:  So, the question I asked is where.

23           MR. AIDALA:  Where exactly is the apartment?

24           THE COURT:  I didn't say exactly, I just asked where.

25           MR. AIDALA:  I would have to ask my client that, your

L6G5meyS

1    Honor.

2            THE DEFENDANT:  Yes, it is in Soochow, China.  So,

3    that's the location, your Honor, where the visiting

4    professorship was housed but, like my attorney said, I stayed

5    at the Renaissance and Double Tree hotels in my three or four

6    trips.  That's it.

7            THE COURT:  Thank you.

8            THE DEFENDANT:  Thank you, your Honor.

9            THE COURT:  Go ahead, Mr. Aidala.

10            MR. AIDALA:  And to answer your question again about

11    the Soochow University visiting professorship, he has no

12    contract with Soochow University or an employment agreement to

13    be a visiting professor there or whatever documentation would

14    be typical of someone who is a visiting professor who was there

15    on a regular basis.  I believe it's a little bit of the

16    semantics here that Soochow University was the location that

17    the Thousand Talents Program used to house the guest lecturers.

18            And, your Honor, just to be clear, when Mr. Meyyappan

19    would go to lecture, there were many American professors in the

20    audience.  It is an international society of people in the

21    research field and in the scientific field.

22            And also, your Honor, since you are focusing on this,

23    they did offer him money, the Thousand Talents Program; they

24    did offer him money to leave NASA and go and work there

25    full-time.  I believe the number which is indicated in the

L6G5meyS

1    paperwork before the Court was $300,000.  And, again, use of

2    the office and use of the apartment but he never even

3    considered it.

4           As you will hear shortly, and I believe the Court is

5    going to realize, working for NASA was a dream of his life, he

6    has been there just shy of 25 years, and he had no intention of

7    leaving whatsoever.  And again, your Honor, the Thousand

8    Talents Program is an intellectual society, it is not the

9    Chinese equivalent of the FBI or the CIA or anything like that.

10          THE COURT:  But that's not what paragraph 22 of the

11   unobjected to presentence report says.

12          MR. AIDALA:  I don't believe it says anything about it

13   being -- well --

14          THE COURT:  Well, it says, let's be clear:  However,

15   per the government, based on e-mail communications between

16   Meyyappan and his Thousand Talents Program contact, the contact

17   stipulated that Meyyappan's annual salary would be 1.8 million

18   RMV which is the equivalent to $278,297.42.  If this was in

19   fact a payment, Meyyappan would have received approximately

20   1,391,000 representing five years of employment.  However, as

21   we noted, the government has no evidence that the salary was

22   received.  So, there is no record of any transfer into a

23   U.S.-based account.

24          Where does it say that this is conditioned upon

25   Mr. Meyyappan leaving NASA?  I don't find that in paragraph 22

L6G5meyS

1    or anywhere.

2          MR. AIDALA:  Well, I would say, your Honor, if you are

3    going to be a strict structuralist you would look at that

4    sentence and look at the words "would be."  Had he accepted it,

5    it would be.  It was an offer that was made that was not

6    accepted.  So, if tomorrow I got an offer from Cleary Gottlieb

7    to leave my law firm and this would be my salary and this would

8    be my apartment, that doesn't mean I ever took it, that doesn't

9    mean I ever accepted it, and I believe Mr. Naftalis would

10   corroborate the fact that they have no evidence that

11   Mr. Meyyappan even considered it let alone accepted it.

12         THE COURT:  No, no.  But you are saying this is an

13   offer that was conditioned on leaving NASA.  Where do you get

14   that from?

15         MR. AIDALA:  From my conversations with Mr. Meyyappan.

16   I am not saying that's in the record somewhere but that was --

17   they weren't going to pay him $300,000 a year to show up three

18   days a year which is basically what took place here.  They were

19   going to pay him $300,000 a year as a job.  It was a job offer,

20   your Honor.  It was a job offer and if you actually -- if

21   someone looks up this society they have two functions:  One is

22   to have visiting professorships; and two is to recruit

23   full-time professors.  So, they got and they lured him into

24   being a visiting professor and now they were offering him a

25   full-time professorship to which he rejected.  So, the reason

L6G5meyS

1  why I didn't object, your Honor, is, to the word "would," his

2  conversation "would be," not that his compensation was.  Had he

3  accepted it, it would be.  So, it was an offer that wasn't

4  accepted.

5          THE COURT:  Is Mr. Meyyappan representing that he

6  received no money from the Thousand Talents Program for Soochow

7  University?

8          MR. AIDALA:  A hundred percent except for

9  reimbursement of his expenses to fly and his hotel and his

10  meals.  Absolutely he is saying he received not one nickel and

11  he will tell you that himself momentarily.

12          THE COURT:  Does he have any overseas bank accounts?

13          MR. AIDALA:  I don't know the answer to that question

14  but he is indicating no, your Honor.

15          THE COURT:  Is that right, Mr. Meyyappan?

16          THE DEFENDANT:  Yes, your Honor.  I have no overseas

17  bank account.  I have nothing.

18          THE COURT:  Mr. Aidala, I am curious.  I have read a

19  lot about Dr. Meyyappan's distinguished career; the awards he

20  has won, the esteem in which he is held, and I see that he was

21  paid by NASA, at least his adjusted gross income which I guess

22  includes also investment income, ranged from about

23  one-hundred-forty-some-odd-thousand to 192,000 per year.

24          Is that right, Mr. Aidala?

25          MR. AIDALA:  That is my understanding from my client;

L6G5meyS

1   yes, your Honor.

2           THE COURT:  And he has worked for NASA for 25 years,

3   right?

4           MR. AIDALA:  Yes, your Honor.

5           THE DEFENDANT:  Yes.

6           THE COURT:  And before that he worked for a company

7   that's now out of business and he was making $84,000 a year

8   there, right?

9           MR. AIDALA:  Yes, your Honor.

10          THE COURT:  And he met his wife who was in the

11  accounting department there.  And Mr. Meyyappan, to his credit,

12  came from rather humble circumstances; his father had a rather

13  small book store in India.  And, I am curious, how does

14  somebody in that situation acquire a net worth in excess of

15  $6.5 million?

16          THE DEFENDANT:  Can I answer that?

17          MR. AIDALA:  Dr. Meyyappan, I am sure the Judge is

18  going to allow you to speak.  I will just tell you what my

19  observations are, your Honor.  Obviously I was not ready for

20  that question but if you read what my client -- well, I'm going

21  to take that back because it is what he wrote to me.  He works

22  about 80 hours a week -- or he did work about 80 hours a week.

23  I don't think he has any other spending habits except some

24  nourishment.  I don't know about any vacations.  When I spoke

25  to him about the conditions of his bail and whether he needed

L6G5meyS

1   to travel anywhere he says, no, I don't go anywhere unless it

2   was for business.

3           So, again, your Honor, before I have Dr. Meyyappan

4   answer that question, I then would like the opportunity to

5   speak with him offline, if that's possible.

6           THE COURT:  Sure.

7           MR. AIDALA:  Only because I wasn't prepared for that

8   and I would like to hear what he is going to tell the Court.  I

9   don't know how we are going to work this out but I can just

10  call him.

11          THE COURT:  Yes, you can call him and we can take a

12  break while you do that and so you --

13          MR. AIDALA:  I will just need a moment, your Honor.

14          THE COURT:  Leave your line here and Dr. Meyyappan can

15  do the same and you can call offline.

16          MR. AIDALA:  Thank you, your Honor.

17          THE COURT:  And why don't you turn away from the

18  camera.  That would be best.

19          (Defendant and counsel conferring)

20          MR. AIDALA:  OK.  We are ready to roll whenever the

21  Court is.

22          THE COURT:  OK.  Go ahead, Mr. Aidala.

23          MR. AIDALA:  Your Honor, may I have the permission to

24  just have my client answer this question directly?

25          THE COURT:  That's fine.  That's fine.

L6G5meyS

1              Doctor, can you hear us?

2              THE DEFENDANT:  Yes.  Can you hear?

3              MR. AIDALA:  Yes.  I have the Court's permission for

4    you to answer that question directly.  So you can answer the

5    question about your money.

6              THE DEFENDANT:  OK.  Thank you, your Honor.

7              The first thing that I want to mention is, yes, I'm

8    not a spring chicken, I'm 67 years old and I have worked pretty

9    much close to 30 years and that's a lot of accumulation.  And I

10   have no children, I didn't put through a single kid through

11   college.  I have taken care of, and you all know who have

12   children, how much children cost from zero to, let's say, 18.

13   These days kids actually, even after they graduate, they come

14   back and live with you.  I didn't have any of those things.  I

15   never did anything other than work.  All I ever did was work

16   and I didn't even go on vacation and all of those things

17   because I was on other trips.  OK?  So, I'm say saver, I'm not

18   a spender.  But, if you look at those numbers, some of those

19   numbers are inflated.  OK?  And I'm not living in the middle of

20   Iowa, and I am living in the craziest place for real estate in

21   the Bay area.  I bought a house for $400,000 and that today is

22   a little more than, I don't know, $1.2 million, $1.3 million

23   more than what I bought for.  And then I had a second house

24   which I bought and that also tripled in value.  So, these are

25   inflated numbers.

L6G5meyS

1          And then, if you take a look at the actual details,

2     most of the money, approximately over $2 million, is from my

3     Thrift Savings Plan.  OK?  And I must admit that NASA and the

4     government has done a very wise investment.  So, in 25 years,

5     my Thrift Savings Plan has grown tremendously.  Without it, and

6     now without a job, I could be destitute.

7          So, I can only take credit for out of the

8     $6.5 million, I can only take credit for probably half

9     a million or something which is there in non-retirement,

10    non-house activities.  So, in that sense, that's only modest.

11    The rest of them are the government doing a good job on my

12    Thrift Savings Plan plus the inflated California real estate.

13    That's pretty much what any financial adviser would tell you

14    too.

15          Thank you, your Honor.  If you have further questions,

16    I will be happy to answer.

17          THE COURT:  All right.  Thank you, Dr. Meyyappan.

18          Go ahead, Mr. Aidala.

19          MR. AIDALA:  So, your Honor, I think it is very

20    important for the Court also to know that Mr. Meyyappan has no

21    security clearance.  There are I believe nine levels, nine

22    being you have top-top secret clearance.  He doesn't have any.

23    He is all the way at the bottom.  He is not involved in the

24    space shuttle program.  He is not involved in the Mars program.

25    He doesn't have any access to any top secret information that

L6G5meyS

1  would be of value anywhere.  So, any thoughts of him receiving

2  money to give over information just should be wiped out because

3  he doesn't have that kind of information.  All of his research

4  is done in real-time, overseen by NASA, overseen by his

5  employees at NASA, and are all public and all published.  I

6  think it is 425 papers he has written.  So, the Court should

7  not have the impression that Mr. Meyyappan has some information

8  that is of financial value or worth anything.

9          So, the Court may be wondering, so why did he do this?

10  Why he is he doing this?  He is going to tell you in a second.

11  It is ego.  It is an ego trip.  It is very prestigious and he

12  is watching his friends in other places like in research

13  hospitals, like in universities, they're able do this.  And

14  they go there and they get treated like kings and they're

15  lauded and they speak to hundreds of people, thousands of their

16  colleagues.  You are the creme de la creme.  And NASA doesn't

17  allow to you do that.  And what he is guilty of and why he got

18  fired is he thumbed his nose at their rules.  He thumbed his

19  nose at their restrictions because of his own ego, because of

20  his own pride.  And, boy, is he paying the price, your Honor.

21  Just to put it in context, him getting fired from NASA would be

22  like myself or Mr. Naftalis getting thrown out of the bar.  It

23  is the same thing.  It is not like, you know, he is going to go

24  get picked up by somebody else no matter how great his

25  qualifications are.

L6G5meyS

1          So, I just don't want the Court to have the feeling

2     that he was passing secrets away for money.  If there was any

3     indication of that, even if it was circumstantial evidence

4     trust me, your Honor, I have enough confidence in the Southern

5     District of New York prosecutors and the federal investigators

6     that the charges here would be much more severe and they

7     wouldn't be the lowest charge and the lowest guideline that's

8     really in the book.

9          I don't know what the Court is thinking, obviously.  I

10    hope the Court is not considering incarceration here.

11    Probation has recommended probation.  I ask the Court for

12    time-served not really for Mr. Meyyappan, because probation

13    versus time-served for a guy, because of the way he lives and

14    the Coronavirus, he doesn't leave his house anyway.  So, this

15    isn't a guy who is a man about town and probation is going to

16    have any impact.  I wanted to save our taxpayer dollars

17    because, in my opinion, it is just a waste of time that

18    probation look after a guy like Dr. Meyyappan.  And obviously,

19    your Honor, you studied and almost memorized his background so

20    I don't think society is concerned at all about Mr. Meyyappan

21    and violating any laws.  The punishment is the firing from

22    NASA.  Besides that, obviously being a convicted felon for the

23    rest of his life at this point in his life.  And those of us in

24    the legal community don't live in his world, but as your Honor

25    knows, if someone of his stature in our community had the fall

L6G5meyS

from grace that he had, the disgrace is something, as he
mentioned and will mention, that he will be living with for the
rest of his life and his storied career that he had is gone.
He is one of a handful of people of the hundreds of thousands
in the history of NASA, he is in the Hall of Fame.  He is in
the NASA Hall of Fame.  And now, he is disgraced.

So, your Honor, he has been punished severely.  I am
not going to go through all the 3553 elements.  I think we do
so pretty well in our letter.  I know the Court prides itself
on efficiency but the fact that that he has never been in
trouble before, he doesn't need any specific deterrence.
Losing the job at NASA and that whole industry knows about it,
that's the general deterrence.  The fact that he is a convicted
felon, that's the general deterrence.  And I would hope, if the
Court is considering incarceration, you are going to keep in
mind his age, his lack of criminal record, the fact that during
this COVID time he is in that handful of people who cannot
protect themself and get the vaccine.  I would ask the Court if
the Court wants to really punish him, a period of home
confinement would be severe in my opinion but if that's what
the Court felt was necessary.  I think Mr. Naftalis will
support some of what I said in his remarks in terms of there
being no evidence that he is a spy, in terms of there being no
evidence that they have their hands on him for receiving a
$300,000 salary, or him having his own apartment with clothes

L6G5meyS

1  in it or his stuff in it.

2         So, your Honor, would I just ask the Court to keep his

3  backgrounded in front of your mind not only in America but all

4  the young people he has helped around the world from Africa to

5  Idaho.  As the Court knows, the letter from Boise, Idaho, is

6  very powerful.

7         So, he is a man who has given the most of his

8  abilities to as many people as he possibly can, he made a

9  horrible mistake, he has paid for that mistake on two different

10  levels -- professionally and personally -- and, your Honor, I

11  am asking the Court to give a guideline sentence of probation

12  and if the Court finds I gave any reason for variance, a

13  sentence of time-served.

14         Thank you very much, your Honor.

15         THE COURT:  And should there be a fine?

16         BOTTOM LEFT:  We have no objection to any fine that

17  the Court thinks is appropriate, your Honor.

18         THE COURT:  All right.

19         Dr. Meyyappan, this is your opportunity to speak,

20  address the Court directly, and bring to my attention any facts

21  or circumstances you believe I should take account of.

22         THE DEFENDANT:  OK.

23         THE COURT:  Anything you wish to say, this is the time

24  to say it.

25         THE DEFENDANT:  Thank you very much, your Honor.

L6G5meyS

1        I want to start out by saying I am extremely sorry and

2   I am deeply saddened that I am sitting here in front of you

3   today, and I put myself in the incredible -- this is the worst

4   thing that I have ever done and I never thought, in my 67

5   years, I would be here today.  OK?  I am extremely sorry and I

6   have deep regrets and sadness.  OK?

7        Let me start out by saying I'm not a bad person by any

8   standard.  You could see all of that in the presentencing memo

9   my esteemed attorney Mr. Aidala submitted to you describing all

10  of my accomplishments and service to society, etc., etc., etc.

11  I don't want to go through any of that as you have read it and

12  I don't want it waste your time.  But, I must admit -- I must

13  admit -- I must admit -- in spite of all of those things, in

14  spite of all of those accomplishments, I simply cannot deny I

15  have made bone-headed mistakes.  I was careless, I overlooked

16  NASA regulations and I violated them which I have come to

17  regret greatly.  And I was charged with doing certain things

18  and the federal investigators, they came to me and they

19  questioned me.  I panicked.  I panicked.  I lost my exposure.

20  I evaded answering them truthfully.

21        Being on the hot seat for the first time, I don't care

22  how many times you have seen this on TV and movies, OK, it

23  doesn't matter how many times you have seen it but when you are

24  on the hot seat for the first time in your life and the gravity

25  of that, that sent me to the panic mode.  None of this is an

L6G5meyS

1   excuse.  OK?  It is not an excuse.  But, my truthful

2   explanation of what happened at that regrettable moment and I

3   will live with this for the rest of life, OK, and I broke the

4   NASA rules, but my university colleagues with whom I compete, I

5   do the same kind of work, basic research and I compete with

6   them for academic publications, name and fame and all of that

7   thing, and they could do all of these things freely because

8   universities are open living but I could not do it because I

9   work for the government.  Like my attorney said, I was blinded

10  by my ego and I was driven to get to the top in a competitive

11  chain so it was all of the ego trip, not money or any

12  meticulous planning or calculated actions to hurt NASA or my

13  country.

14          Your Honor, please understand and know, I did not

15  betray my country.  I did not betray NASA in any way.  I

16  never -- never -- gave anything away.  In fact, I never had

17  anything to give away.  All my work and the results of my

18  research were openly published in academic journals and

19  presented in conferences.  And NASA has got something called

20  Technology Readiness Level -- TRL.  It is like a ladder, it has

21  got 1 to 9; 7, 8, 9, all of those things mean that you are up

22  there in space and technology is ready to fly and so on and so

23  forth.  On the other hand, the lower rung like 1 and 2 are

24  basic research, that's what universities do.  My research was 1

25  and 2.  I didn't go to 7 or 8 or 9.  I didn't even go to 4, or

L6G5meyS

55, or 6.  So I was basically 1 and 2.  So I was doing what

universities do so I had never anything -- I didn't have

anything to give away.  And, also, I have no reason to betray

my country or NASA.  I did not.  They both have been very, very

good to me, in fact great to me.  They allowed me to succeed

professionally and personally.  I love NASA, I love my country,

and both have been tremendously good to me and they made me who

I am.  I even mentioned they did a good job investing my Thrift

Savings.  OK?  So, they made me who I am today.  Without my

country and without my NASA, please note I would be a

small-time engineer in some small town in India among 1.4

billion people.  OK?  But today, I have received, since 1996, I

have excelled at everything I did at NASA; I have produced

results, I have produced publications, and I have got numerous

wards including a presidential award.  OK?  So, I have

absolutely no reason, your Honor, and that is the proof.  OK?

          And regardless of all of these things I said, I am

extremely contrite and truly sorry.  I will live with this

shameful episode for the rest of my life.  I have lost face and

I have lost my normal life since December 10, 2019 when the

federal agents came to my house.  I have not been the same

person since that day.  And because of the tremendous burden

and the anxiety the whole thing has placed on me.  Every single

day since that day I have been asking myself, How could you do

this?  OK.  And I am broken down by this, your Honor.  And I

L6G5meyS

see people all around me living their lives happily, doing
their chores peacefully and routinely, enjoying small and big
things in life but I can't do it with the weight and the burden
of the cases and the consequences, they have made it very hard
for me.  So, life has been truly a torture the last 18 months
and that is not an understatement, your Honor, it is absolutely
the truth.

And, your Honor, as you know, I'm a first-time
offender, I have no blemish until now.  I was already fired
from the NASA job, the one I excelled at, the one I loved, and
the one I was very proud of.  I can never get back into federal
service again.  And also, in my field, the industry is tied to
the government funding, they will not overlook my felony
conviction if and when I seek employment.  And also, the press
release made by the government and the subsequent coverage by
CNN, Bloomberg and everybody, that was extremely damaging to my
reputation.  And so, your Honor, in summary:  I'm finished.  I
wouldn't get any employment.  I lost my future, the one I had
worked so hard for for 40 years.  No job and no -- I am 67.  I
am totally broken down, your Honor.

And, as my attorney said, this case started out with
an SEC case against Mr. Jeremy Barbera and, as he alluded to,
as my esteemed attorney alluded to, I fully cooperated with the
federal agents in that case and I taped all my conversations
with Mr. Barbera at the arrangement of the federal agents, I

L6G5meyS

1    asked Mr. Barbera the questions given to me by the agents.  I

2    did everything they asked me to do.  I was fully cooperative.

3    My understanding is the case is closed and I don't know how

4    helpful I was but the results are not the thing that matter,

5    the most important thing is I cooperated.

6           So, as my attorney suggest, please, do not send me to

7    prison and, instead, please allow me to do public service as a

8    part of my normal life like I always did.  I am good at it and

9    I was always devoted to it.  Your Honor, this will benefit the

10   society because there is a need for what I can provide to the

11   young people and public at large based on my public service.

12   It will give me something to look forward to and draw

13   satisfaction of being useful in the next phase of my life,

14   useful to the society and retain at least some pride.  OK?  I

15   lost everything but I would like to return at least some pride.

16   I can give you some examples.

17          So far when I went to high schools and talked to kids,

18   I always focused on what they call STEM, is Science,

19   Technology, Engineering and Mathematics.  One of the things I

20   can do now is I can add ethics to that portfolio based on my

21   experience.  Because what it is is these kids are going to go

22   and become engineers and scientists and they're going to be in

23   ethical situations like I am, and there are not a whole lot of

24   guidelines and you want to tell them when they're 15 rather

25   than waiting, for example, one case –– I have already started

L6G5meyS

making up case studies which I can incorporate in my

presentations.  For example, one kid that grows up into working

for a company as a waste disposal engineer, can he discharge

something into the groundwater violating the EPA just to save

money for his company and get a bonus?  OK.  And a biochemical

scientist or engineer working for a pharma, what about the

debate actually about checking for all the side effects versus

time to market?  OK?  And making profit for the company.  They

are going to be posed with ethical questions every single day.

I want to speak from my experience, I want to tell them that it

is not up to you to decide what rules to follow, what rules to

ignore.  OK?  But what it is, you have to follow the rules even

the ones you don't like.  OK?  Not like what I did.

          So, I want to be of service to the public so that's

one reason why, please don't incarcerate me.  Then, obviously,

I have a couple of selfish reasons like every human being at

the end of the day is selfish, the selfish reason is my wife is

70 years old.  For 35 years she has been a housewife and before

that, as you saw, she was working in the company.  And she

hasn't done anything, she depended on me, even for simple

things from paying bills all the way to taking care of the

financials and so on and so forth.  And so, we support each

other.  I am her support system and taking me away, she will

collapse, her support system will collapse, and I want to pay

her back for her being an extremely loyal and great wife.  In

L6G5meyS

1    fact, I have been living in this country for 40 years and she

2    and I don't have absolutely anything in common and I came

3    10,000 miles away from her but what it is is we have both a

4    great life.  She is the best thing that ever happened to me.

5    OK.  So that is the thing.

6            And the last thing, but not the least one, is COVID.

7    I didn't commit any kind of capital crime or I'm not a threat

8    to the society, I didn't murder anybody.  What it is is this

9    COVID is a serious thing.  It hasn't completely gone away.

10   Yesterday's paper said we still have 60,000 new cases every day

11   and a lot of the new variants and one of the things we still do

12   is allow international flights.  And talking about

13   international, India is the worse suffering country in terms of

14   COVID but we have eight Air India flights coming every day from

15   this country from New York to San Francisco bringing in 2,000

16   people.  If even five people have it they're the ones who are

17   spreading the Indian variants which is spreading in the Bay

18   area.  So, it is a serious issue.  So, please take that into

19   consideration and what my attorney said.

20           So, those are all the reasons, your Honor, that's all

21   I wanted to say.  If you have any specific questions, please

22   grill me and I will answer anything that you want.  Thank you,

23   your Honor, and I beg for you forgiveness

24           THE COURT:  Thank you very much.

25           This is the government's opportunity to speak.

L6G5meyS

1           MR. NAFTALIS:  Thank you, your Honor.  You have the

2    government's letter, I just want to go back over some of the

3    context, for your Honor.  Mr. Aidala, largely I agree with what

4    he said but I want to give your Honor the context.

5           Just for the record, Mr. Meyyappan resigned when he

6    was about to be terminated.  I don't think it really matters

7    but it allowed him to preserve his benefits but it was

8    technically a resignation, just so you understand.

9           Mr. Aidala is correct, the origins of this case were

10   the Government was investigating a securities fraud case which

11   is actually before Judge Koeltl right now and it is scheduled

12   for trial in November.

13          When the agents approached Mr. Meyyappan he was

14   questioned about his foreign employment contact.  Just so you

15   know.  And some of his answers there were -- I don't think they

16   were alleged to have been false but they were not forthcoming.

17   And when we approached Mr. Meyyappan about having a

18   full-fledged proffer with him through Mr. Aidala, this was one

19   of the topics that was flagged.  And I don't want the Court to

20   be left with the misimpression that his foreign employment and

21   Thousand Talents affiliation was somehow sandbagged during the

22   proffer; it was a topic for discussion.  And during the proffer

23   session we did take a break where I spoke to Mr. Aidala, as I

24   recall, indicating that this was not -- we didn't find this to

25   be truthful and it continued.  And we did show documents about

L6G5meyS

the professorship and the like to the defendant during it and
he continued to lie.  It is true, I do not have evidence that
he received the $300,000.  All I have is an indication that it
was being offered.  I don't have any visibility into his
foreign finances, we do not have evidence of foreign bank
accounts.  What we have is sort of the U.S. side of things.
So, I just want to be clear with that.

            That said, lying to the government is serious and
while he pled to lying during a proffer session, the lies were
ongoing for eight years.  So, again, I don't want the context
to be he-lied-during-a-proffer-and-the-government-charged-him.
That was not the full scope of the conduct even though that is
what he pled guilty to.  It was misleading the government,
lying to the government for years about his foreign
associations.

            That said, we agree that Mr. Meyyappan is a first-time
offender, he is obviously a prominent scientist, it is a big
deal to get fired by NASA or to resign from NASA.  And the
government felt that the appropriate disposition, given all of
the conduct involved here, was a 1001 charge, it was not, as
Mr. Aidala would dispute, it was not an espionage charge or the
like, it was lying about what we thought was serious conduct.
With the Thousand Talents Program we do not agree it is sort of
an innocuous organization, it both licitly and illicitly tried
to gather scientific and technological information,

L6G5meyS

1   intellectual property from foreign countries including the U.S.

2   to the benefit of China.  So this isn't like going to give a

3   lecture at Yale or something, it is an organization that the

4   U.S. government is focused on.

5           If your Honor has questions I am happy to answer them,

6   but I wanted to put that in context for you.

7           THE COURT:  Thank you.

8           This is the Court's statement of reasons for the

9   sentence to be imposed on Meyya Meyyappan.  In sentencing the

10  defendant, I have considered all the materials referenced at

11  the outset, the very powerful memorandums submitted by defense

12  counsel laying out the extremely impressive career of the

13  defendant.  I have considered the government's submissions as

14  well.  And, I have already adopted the facts set forth in the

15  PSR as my findings of fact.

16          I have considered each of the factors under

17  Section 3553(a) and I need not recount all that I have

18  considered but I have considered them all.  I will mention

19  some, including the nature and circumstances of the crime.

20          The crime does relate to what happened on October 27,

21  2020 in an interview which the defendant had with the FBI, the

22  Office of Inspector General of NASA, and the U.S. Attorney's

23  office.  But, there is a prelude to this.  There is a China

24  exclusion policy set by Congress which prohibited NASA from

25  entering into any cooperative agreement of any kind, to

L6G5meyS

participate or collaborate or coordinate bilaterally in any way
with China or any Chinese-owned company.  And, NASA defined
China or Chinese-owned company to include Chinese universities.
This is foreign policy set by Congress, not by NASA, not by the
judiciary, not by the U.S. Attorney's office.  As a NASA
employee, Mr. Meyyappan was prohibited by a federal regulation
from outside employment activities without approval, meaning
any form of compensated or uncompensated, non-federal
employment.  This is in 5 C.F.R. 6901.103.  And then,
Dr. Meyyappan was required by federal regulation, every year,
to file a form 278e with the Office of Government Ethics.  The
278e form requires disclosure of positions held outside the
United States government.  That can even be a family trust has
to be disclosed and any travel reimbursements.

        Now,the undisputed evidence is that Dr. Meyyappan
applied for admission into the Thousand Talents Program in 2016
and you will hear about his activities between 2016 and 2020,
but each year he had to sit at his computer terminal and think
about what he was going to put on the 278e.  Was he going to
disclose these positions?  Was he going to disclose
reimbursement?  And of course one would expect this would
trigger in his mind the fact that it requires permission before
he has or takes on outside employment activities even of an
uncompensated nature.

        So, Dr. Meyyappan was accepted and participated in the

L6G5meyS

Thousand Talents Program, and between 2014 and 2020 he was a

visiting professor at Soochow University and gave lectures,

wrote papers, received reimbursement for travel.  Between 2009

and 2020 he was a distinguished visiting professor at Pohang

University of Science And technology in South Korea.  And,

between 2013 and 2020 he was a visiting professor at Tohoku

University in Japan, and again gave lectures, wrote papers,

received reimbursement.  He didn't disclose his associations,

he didn't seek approval, he didn't put this down on his Office

of Government Ethics annual report and it was in this context

that he falsely stated that he was not a member of the Thousand

Talents Program and that he did not hold a professorship at

Soochow University.

Now, Dr. Meyyappan had never before been charged or

convicted of a crime.  He has held the important and esteemed

position of Chief Scientist, Exploration Technology, at the

Center for Nanotechnology at NASA's Ames Research Center.

What happened here is undoubtedly devastating to the

defendant.  It is not a happy circumstance for NASA either in

terms of reputation or the loss of Dr. Meyyappan.  That's a

loss to NASA also, and it is a loss to the people of the United

States that they don't have the benefit of his talent.  I want

to make it plain that this Court has nothing whatsoever before

it -- nothing whatsoever -- that suggests that in any way,

shape, or form, Dr. Meyyappan was intentionally disloyal to the

L6G5meyS

United States or intentionally disclosed anything that was
sensitive, but NASA and the United States government agreed to
sets its policies for its employees and to impose obligations
of disclosure, and when he lied in October of 2020 this, in
turn, revealed what had happened and what activities he had
been engaged in.

         Now, Dr. Meyyappan has enjoyed a wonderful reputation.
In fact, I assume that his, the people who have written on his
behalf know of the crime to which he has pled guilty.  So, but
they don't think that that reflects on his integrity and that's
somewhat troubling and even Dr. Meyyappan acknowledges that.
He wants to teach ethics because he knows that it does.  It is
an ethical issue, it is a serious ethical issue.  But, we are
not here because it is a serious ethical issue, we are here
because it is a crime.  And I, myself, and my colleagues, fill
out disclosure reports every year.  They're painfully detailed
and we try and do our honest best and certainly Dr. Meyyappan
knew he was not disclosing his outside activities.  He may have
sincerely believed they were innocuous.  I accept that.  But
that was not a decision for him to make alone while he was
employed by NASA.

         I have considered the need for just punishment.  The
crime should be punished.  And one of the things that I think
is important to say is I took an oath to treat all persons
without respect to their personhood, meaning to treat all

L6G5meyS

people equally and do equal justice to the rich and the poor.
I get cases of people who are not well off who lie on their
application for Section 8 housing, who lie on their application
for social security benefits, and it's tragic because these are
people who are telling these lies in some instances to make
their life a little bit financially easier.  They have their
own motive.  They're not the same motives necessarily as
Mr. Meyyappan, but equal justice under the law means that I
don't have a set of rules for the well-educated, for the
well-heeled, that are a different set of rules than for the
woman who lies on her Section 8 housing.  I must enforce
equally, and in this situation I am dealing with a gentleman
who is soon to be 67 years of age who has, although he
describes his health as good, he has -- I would ask the people
to please mute their lines, thank you -- medical conditions and
he takes medications, and I take everything that he said at
face value about his wife and her dependence on him.  So, the
unpleasant situation that I am in is I have to fashion a
sentence that is just and consistent with the 3553(a) factors
including considering the guidelines policy statements and
official commentary of the United States Sentencing Commission;
I consider it an advisory matter and recognize I am not
obligated to sentence within the guidelines.

　　　　　What I propose do is to impose a brief incarceratory
sentence and defer the surrender date until May 3rd, 2022, when

L6G5meyS

1    hopefully the present pandemic will be behind us.  So, I

2    propose to sentence the defendant to 30 days' imprisonment, not

3    impose any supervised release or probation, impose a fine of

4    $100,000, and a special assessment of $100.  The foregoing is,

5    in my view, sufficient but not greater to achieve the purposes

6    necessary of section 3553(a).

7           Does the defendant or his counsel have any objection

8    to the Court's proposed sentence or to the statement of reasons

9    for that sentence?

10          Go ahead, Mr. Aidala.

11          MR. AIDALA:  Yes, your Honor.  My client had asked me,

12   prior to this proceeding, that if the Court was going to impose

13   a jail sentence whether the Court would consider imposing a

14   longer period but allow him to stay at home with an ankle

15   bracelet.

16          THE DEFENDANT:  Can I add to that?

17          THE COURT:  Your lawyer is capable of addressing that.

18          I understand the request.  What I am going to do is

19   I'm going to permit him to surrender to the United States

20   Marshal for the Northern District of California.  It is

21   important, from my standpoint, in terms of the message that is

22   sent, that there be a brief period of incarceration and that's

23   why it is 30 days and no supervised release.  I don't believe

24   the same message is delivered by community service, by home

25   incarceration, by an ankle bracelet, or the like.

L6G5meyS

1        So, I have considered your request, Mr. Aidala, and I

2   have worried about this and labored over it and I am sorry that

3   I cannot grant that request.  Anything else, Mr. Aidala?

4        MR. AIDALA:  No, your Honor.  I think you have heard

5   enough from me over the last couple of days.

6        THE COURT:  No, no, no.  I enjoy having you.  You are

7   a great advocate and I appreciate -- I can't tell you how much

8   I appreciate your preparation and your vigorous advocacy on

9   behalf of your client.  This is what the practice of law is

10   about and it is the highest nuance of our profession so there

11   is nothing for you to apologize for.

12        Mr. Naftalis, any objection from the government to the

13   sentence or the statement of reasons for the sentence?

14        MR. NAFTALIS:  No, your Honor.  Thank you.

15        THE COURT:  All right.

16        THE DEFENDANT:  Can I ask for some clarification, your

17   Honor?

18        THE COURT:  I haven't imposed sentence yet but go

19   ahead.

20        THE DEFENDANT:  You mentioned it is it is 30 days

21   starting sometime May 22nd of next year plus --

22        THE COURT:  May 3rd, 2022.

23        THE DEFENDANT:  OK.  And then a $100,000 fine,

24   correct?

25        THE COURT:  That's right.

L6G5meyS

1              THE DEFENDANT:  And so, in between now and May 2nd am

2       I on probation or --

3              THE COURT:  No.

4              THE DEFENDANT:  OK.

5              THE COURT:  You are actually on pretrial release.

6              THE DEFENDANT:  OK.

7              THE COURT:  Which means that you continue what you

8       have been doing up until now.

9              THE DEFENDANT:  I see.  OK.

10              THE COURT:  That remains the same.

11              THE DEFENDANT:  Yeah.

12              THE COURT:  All right.

13              Meyya Meyyappan, it is the judgment of this Court that

14       you are remanded to the custody of the United States Bureau of

15       Prisons to be imprisoned for 30 days.  Taking into account your

16       assets and other factors under Section 3553(a), I am imposing a

17       fine of $100,000 which is due and owing 90 days from the date

18       of judgment in this case.  Further, I am imposing an assessment

19       of $100 which is due and owing immediately.

20              You have the right to appeal the sentence I have

21       imposed and if you cannot afford the cost of an appeal, you may

22       apply for leave to appeal as a poor person.  The time limits

23       for filing a notice of appeal are brief and they're strictly

24       enforced.  If you request, the Clerk of Court will prepare and

25       file a notice of appeal on your behalf.

L6G5meyS

1          Do you understand all of that?  Do you understand all

2     of that?

3          THE DEFENDANT:  Yes, I understand.

4          THE COURT:  If it comes to pass that you want me to

5     accelerate your surrender date I will do that.  But, it is

6     surrender on or before May 3, 2022 at 2:00 p.m. -- that's a

7     Tuesday -- to the United States Marshal for the Northern

8     District of California.

9          Is there anything further from the government?

10          MR. NAFTALIS:  No.  Thank you, your Honor.

11          THE COURT:  Anything further from the defendant?

12          MR. AIDALA:  No.  Thank you, Judge.

13          THE COURT:  And let me say, Dr. Meyyappan, you will

14     get past this, you will put this behind you, and I wish you a

15     very long and healthy life and productive life and I think you

16     will go on to get past this.  And so, I am very sorry for the

17     circumstances that brought us all together today and I wish you

18     and your family the best.  We are adjourned.

19          THE DEFENDANT:  Thank you, your Honor.

20                              o0o

21

22

23

24

25